## COBB v. BALDWIN et al.

### No. 5476.

Court of Appeal of Louisiana. Second Circuit.

Jan. 3, 1938.

Hudson, Potts & Bernstein, of Monroe, and Madison, Madison & Fuller, of Bastrop, for appellant.

744

Edward L. Gladney, Jr., of Bastrop, for appellee.

DREW, Justice.

This is a suit against the trustee for the Missouri Pacific Railroad Company. Plaintiff sued to recover damages for personal injuries alleged to have been received by his minor child, Martha Jean Cobb, in a grade crossing collision in the town of Bastrop, Louisiana, on June 22, 1934, at which time it is alleged that a car driven by plaintiff, in which the minor child was riding, was struck by a train operated by the agent of the defendant. He specifically set out the acts of negligence of defendant, which he contends makes the defendant liable. It is not necessary to enumerate them here, as will show later in this opinion.

Service was made on the defendant by citation addressed to the Secretary of State, served on June 18, 1935, and by citation addressed to F. G. Hudson, Jr., attorney for defendant, served on him June 19, 1935.

Defendant filed the following pleadings in the following order: "Exception to Citation," "Rule to Traverse Pauper's Oath," "Exception to the Jurisdiction, Ratione Personæ," "Exception of No Cause or Right of Action."

The lower court sustained the exception to the citation as to the service on F. G. Hudson, attorney, and overruled it as to service on the Secretary of State. It overruled all other exceptions and pleas, and defendant answered, denying each and every material allegation of the petition, article by article.

The lower court, after hearing the testimony adduced and the case presented by counsel for both sides, rendered judgment for defendant, rejecting the demands of plaintiff, and he is now prosecuting this appeal.

■ Due to our finding on the merits of the case, which will finally dispose of the case, we will pretermit any discussion or ruling on the exceptions and pleas filed by defendant; and for the purpose of this decision, we find without any discussion thereof that defendant's negligence was the proximate cause of the accident alleged upon, and he is liable for any damage or injury sustained in said accident by plaintiff's minor daughter. The first item of damage claimed is $250 for bruises,

contusions, etc., to the minor, Martha Jean Cobb. The record is barren of any substantial proof to show that the minor child received any contusions or bruises in the accident, and necessarily this claim for damages must fail. The fact that there were no bruises or contusions on the child is further borne out by the fact that plaintiff did not make any claim for damages for injuries to Martha Jean until nine months after the accident, although he filed suit for damages to himself and another minor child who was in the car, and compromised same before it went to trial.

In that suit he made no claim for damages for any injuries to his minor daughter, Martha Jean. Plaintiff and his wife both testify that they did not consider Martha Jean to be injured in any way until some time after the accident when, as they contend, she developed spastic colitis of neurotic origin caused by the shock to her nervous system, which shock she received in the accident.

Another item of damage is doctors' bills in the amount of $200, which plaintiff admits here to have been included through error, and no proof was offered thereon.

The other items of damage claimed may well be included in the claim that the shock to the nervous system caused spastic colitis, which caused pain and suffering and permanent injury.

■ As we view the case, the sole question now to determine is: Did the accident cause the child to develop spastic colitis of a neurotic origin? We will discuss the testimony on this question in full. Plaintiff testified as follows:

"Q. Now he has asked some questions about Martha Jean. When did you and Mrs. Cobb first notice anything different, or any change in her physical or mental make up or nervous make up? A. We first noticed it three or four weeks after the accident, and my wife didn't think there was anything the matter with her, and in four or five or six months—all the time she kept complaining and she was nervous and began to fall off in her eating, and in about six months after the accident, we decided to take her to the doctor to see what was wrong.

"Q. During that period of time, you didn't think the child's injuries were serious? A. Yes, sir; not serious enough to amount to anything.

"Q. What was her trouble principally; what did you notice in the child? A. She got to where she complained of her stomach, and she was nervous and easily excited. She would not have anything to do with the other kid and she would complain of her stomach—sometimes she would quit for a while and then she would begin complaining again."

He further testified that he took the child to Dr. Tisdale in the latter part of February, 1936, and to Dr. Leavell in the latter part of December, 1935. That she had lost a few pounds in weight since the accident and up to the time of the trial. That she suffered from constipation and is nervous. When he crosses a railroad track with her, and she hears a train whistle, she becomes highly excited. He further testified as follows:

"Q. If I understand you correctly, Martha Jean complained a little, three or four weeks after the accident? A. She complained some, but we didn't have an examination by the doctor because I didn't think it was serious. I didn't know what the trouble was.

"Q. You took Mary Rose to a doctor? A. Yes, sir. She was complaining as soon as we got to the house after the accident.

"Q. You let Martha Jean complain four or five months before you took her to a doctor? A. She wasn't complaining often, just a little off and on for four or five months, and it began to get more serious and we took her to the doctor to see what the trouble was, and Dr. Leavell prescribed X-rays be made, and I took her to Dr. Lehman at Monroe.

"Q. At the time you settled with the Company, in December, 1934, Martha Jean had been complaining four or five months, that she was not feeling well? A. No, sir; four or five months.

"Q. You said nothing whatever and made no claim for injuries? A. I didn't know what was the trouble. I didn't know that the accident was causing it; she complained a little at times and then she would feel all right for a few days, and about five or six months after she got to complaining more and more, and she got nervous and didn't eat much, and began to be constipated, and we took her to the doctor.

"Q. She went to school pretty regularly during the last two years? A. She was out a few days.

"Q. On the whole, she attended regularly? A. She went when she felt like it, and when she didn't feel like it, I didn't force her to go.

"Q. She lost fifteen or sixteen days each year? A. Something like that.

"Q. Has she been confined to her bed? A. Maybe for a day or two at a time."

Mrs. Cobb, the mother of Martha Jean, testified that Martha Jean would be eight years of age in August, 1936. The case was tried July 7, 1936, and the accident happened June 22, 1934. Martha Jean was therefore approximately five years and ten months of age at the time of the accident. She had been attending school two years at the time of the trial, and had finished her second year satisfactorily. Mrs. Cobb further testified as follows:

"Q. Did either of your daughters suffer any injuries in that accident? A. When they got home, Mary Rose was complaining with her side and they were both crying and one of them said she hurt her side; she said the shift hit her. We didn't pay much attention to Martha Jean. In about a month, Martha Jean got cross and ill and she didn't want anything to eat; she picked over her food and would not eat.

"Q. When did you notice these things in Martha Jean? A. About a month after the accident. I thought maybe she had malaria and I gave her four or five bottles of Groves' Chill Tonic, and she kept getting worse and worse and more nervous.

"Q. Has her condition improved any? A. It has gotten worse.

"Q. Does she suffer from constipation? A. Yes, sir, and her food don't digest good.

"Q. Has she suffered any pain, or complained of pain? A. She complains of her stomach; and she shows it to me and says, 'Mother, feel how hard it is.'

"Q. Does she rest well at night? A. No, sir. She jumps and kicks in her sleep. I sleep with her and she wakes me up.

"Q. She keeps up with her studies fairly well? A. Well, Miss Justine talked to me about her arithmetic, and tried to help her and she would not pay any attention.

"Q. Did Martha Jean ever have any sickness of any sort or any accident prior to the time she was in this wreck? A. I don't reckon we ever had a doctor with her until this happened.

"Q. Mrs. Cobb, how much does she weigh? A. Fifty-two pounds.

"Q. Has she gained weight in the last year? A. She has gained about two pounds.

"Q. And she will be eight years old this August? A. Yes, sir.

"Q. What treatment have you given her in your home? A. We give her mineral oil every night.

"Q. How long have you been giving her mineral oil? A. Ever since she began to complain with constipation.

"Q. How often has it been necessary to give her this mineral oil? A. A tablespoon full every night.

"Q. Is it necessary to do that in order to have normal function? A. If I don't, I have to give her something strong.

"Q. Where have you been buying that medicine? A. Billington's.

"Q. What else have you tried to do for the child; have you had her under any treatments or any doctors? A. We have taken her to Dr. Tisdale for about a year.

"Q. How long has Dr. Tisdale been looking after her? A. For over a year.

"Q. Has he been able to suggest any remedies or anything which would improve her condition? A. He had some prescriptions filled and he has treated her two or three times, and given us prescriptions to have filled for her nerves.

"Q. Have you noticed any improvement in the child? A. I can't tell any.

"Q. Mrs. Cobb, who are your neighbors at present? A. Mrs. Reils.

"Q. Now, I noticed in the last year Martha Jean has been absent from school some fifteen or sixteen times. How far do you live from the school where Martha Jean goes to school? A. I did live just about three blocks, but we moved away and I take them in the car to school.

"Q. Where do you live now? A. About a mile away.

"Q. Were the absences due to her condition? A. She wasn't able to go. She would cry and wouldn't eat any breakfast, and I would not send her. She just wasn't able to go."

She further testified it was six months after the accident before she put Martha Jean under the care of a doctor.

Plaintiff next offered his next-door neighbor as a witness, who testified she had known Martha Jean for about two months; that she played with her children every day; that she liked to romp and play; liked to play all the time, more so than other children; she thought the child was normal, only she was nervous. This is all the lay testimony offered by plaintiff. The other testimony offered by him consists of the testimony of Drs. Tisdale and Lehman. Dr. Tisdale testified as follows:

"A. Martha Jean was brought to me in March, 1935, at which time I made a diagnosis of spastic colitis from the physical findings, history, and an interpretation of some X-ray plates which were brought with her. My diagnosis of spastic colitis was made in connection with an injury or nervous shock which the child sustained in an automobile accident when a train backed or ran into the side of the car. I have seen this child, you might say, monthly, or two or three months apart, from that time up to the present. I have treated the child and advised treatment, but apparently the child does not respond to the treatment. Her nervous condition, instead of improving, apparently grows worse. She has lost weight during the time I have treated her, and I attribute this condition mainly to the nervous shock. This nervous shock, you might term, is something similar or about the same as shell shock in the army. These cases of shell shock sometimes respond to treatment, and sometimes they do not. In this individual, apparently I have seen no improvement. The father states to me when she goes near a train, or any unusual noise, she produces a nervous rigor, which is similar to a patient with shell-shock. The diagnosis of spastic colitis, which I diagnosed this child with, is a misnomer. Spastic colitis infers inflammation—anything ending in 'itis' means inflammation. Spastic colitis is not an inflammation—it is an upset of the nervous system. Some of the authorities would change the name of spastic colitis to mucous colitis, on account of the amount of mucous which passes through the bowels. Others would call it mucous colopathy, getting away from the term "inflammation" with is a misnomer. I bring this in to eliminate the condition which you term inflammation, which it is not. Now this child's condition might improve if she could live out in the country where there were no trains and eliminate the possibility of nerve stimulation. As long as she lives in town, where there is constant noise and irritation to the nervous system, it is my opinion she will not improve.

"Q. How does the condition you describe manifest itself in the child or the physical makeup or physical reaction? A. As a rule, children like that, or anybody else who has mucous colitis, or mucous colopathy. At times they become morose, and would rather be alone and they lose the usual attitude that children have—most children like to be associated with other children. You will find children and grownups with this condition. They like to be alone more than company. They cannot adapt themselves to usual conditions. Anything unusual affects them quickly. They are constipated and at times they have upsets to the intestinal tract, indigestion, etc.

"Q. Does it cause pain? A. Yes, sir, it does.

"Q. What sort of examination did you make before you reached your conclusions, doctor? A. I made a thorough examination of the child, and studied the X-rays made up here in this hospital. I studied the stools and did not find any parasites, and I eliminated chronic appendicitis due to the fact this tends to exaggerate this condition. In a patient with spastic colitis, their condition is always exaggerated if they have intestinal parasites, and chronic appendicitis. The child's urine was negative at all examinations which I made. Palpation and manipulation of the abdomen I found the left side was more sensitive on the left than the right side, and I could feel the descending colon on the left side. That is always pathomonic of spastic colitis. The reason I could feel the colon is due to the thickening or tubing out of the colon. When Dr. Lehman shows the pictures, there will be certain sections—two or three or four inches. It will look like a shoe string, and then there will not be any barium at all, proving conclusively that the colon has contracted and shoved away all of the meal which the child took."

He further testified she weighed fifty-six pounds, and a child eight years of age should weigh sixty or sixty-five pounds; that she had lost weight since being under his care; and he further testified:

"Q. What about the prognosis of her case? A. The prognosis is usually bad in all these cases. You will have an intermittent condition occasionally, both in children and adults where apparently they are doing splendidly, and then an unusual condition comes along and upsets the nervous stability and they go back to the same condition."

He stated there was nothing that would eliminate and cure the chronic constipation suffered by Martha Jean; that he considered her case a serious one, and recovery doubtful. On cross-examination, the doctor said he did not see Martha Jean until nine months after the accident, and there was no positive way he could state positively that her condition was the result of the accident. The only way he could arrive at his conclusions was from seeing the X-ray pictures made six months after the accident, and taking the history of the accident as given him by her parents, together with physical findings. Her parents told him she was normal before the accident; he could not say positively she did not suffer from the present condition before the accident. He further testified:

"Q. You say Mr. Cobb told you that Martha Jean was excited by a train or some other noise. Have you ever seen such a manifestation during your examinations? A. No, sir.

"Q. You have never seen any exhibition of this alleged tendency? A. No, sir. To the contrary, the child hardly will talk to you, which would go along with this morose condition.

"Q. Could that morose condition be affected—could it be assumed at times, and you not be able to tell? A. Yes.

"Q. It could be assumed? A. Yes.

"Q. A child whom you would consider normal, and who liked to play a great deal and was inclined to play excitedly, could come to your office and assume a morose attitude? A. Yes."

On redirect examination, he testified as follows:

"Q. In what way does spastic colitis commence to manifest itself? I mean by that is it of a slow, progressive nature, or how does it first manifest itself in a patient? A. Usually it is very slow. All nervous conditions usually manifest themselves rather slowly unless there is a constant irritation. A patient shell-shocked and constantly being irritated by bombardment and loud explosions, when they do go to pieces, it is more or less sudden; but in cases of this sort, it would manifest itself rather slow. The manifestation of symptoms are practically always objective. The objective symptoms are the patient becomes somewhat listless, not as atten-

tive, and have a tendency to complain of a depressed feeling. The subjective symptoms which you would elicit would be pain in the abdomen, indigestion, constipation and a tired sensation.

"Q. In some of the feces, did you find any excessive mucous? A. I found an excessive amount, and undigested particles of food.

"Q. The fact, if it is a fact, that these things did not manifest themselves in this child to the extent of six or eight months after,—would that affect your diagnosis? A. No, sir.

"Q. Would that affect the causitive factor? A. No, sir, I would still connect it up.

"Q. You eliminated to your satisfaction all other causes of the child's condition? A. Yes, sir."

Dr. Lehman testified as follows:

"Q. Did you have some X-ray pictures which were taken of Martha Jean? A. Yes.

"Have you those pictures? A. I have.

"Q. State, please, your findings? A. This examination consisted of a complete intestinal series, which consisted of an examination not only of the stomach and duodenum, but also the large colon. You can pass over the picture of the stomach and say they were normal. Most of the pathology is in the large colon. In an examination of the colon, we usually take a six hour picture to see the course of the meal. At the end of six hours, normally the head of the meal should be midway between the hypatic and the splenetic flexure. In the case of Martha Jean Cobb, you find the head of the meal in the descending colon; that is, at the end of six hours. At the end of twelve, the head of the meal is in the sigmoid cavity, being in the same position in the twenty-four hour picture, when the examination was completed. On the twelve hour plate, we see demonstrated the so-called 'shoe string signs,' which is characteristic of a readable colon; or, as in this case, a spastic colitis. The string sign is produced by the thinning out like a string by the spastic condition of the colon. The eighteen and twenty-four hour pictures add to the findings of a very spastic condition of the colon, especially on the left side; that is shown in the picture by the absence of the barium caused by the marked contraction of the segments of the descending colon. These two signs, which I have mentioned along with the symptoms which Martha Jean Cobb presents, contribute towards the diagnosis of a readable colon. Parties like Crane and Freidenwell claim that, is a sign to look for, to make a diagnosis of readable colon, or a spastic colon. Along with this, we have the marked spasticity of the colon mentioned before, the symptoms stated by Dr. Tisdale, such as pain in the abdomen, marked constipation, and the passage of mucous in the stools, all substantiate the diagnosis of spastic colitis."

On cross-examination, he said:

"Q. Am I correct in understanding it is the substance of your testimony these pictures reflect a condition in that child that might be called spastic colitis? A. I don't get your question.

"Q. Am I correct in understanding it to be the substance of your testimony these pictures reflect a condition of intestinal abnormality which you term a readable colon? A. Yes.

"Q. That is neurogenic in origin? A. Yes, sir.

"Q. You have no way of telling the court as to what caused this condition, in this particular child? A. The only basis for considering this automobile accident as causing it, is to go into the history of the case; and that is the only thing we can base it on.

"Q. The history, so far as you know may or may not be partial—you took the history as given you? A. Yes, sir.

"Q. So far as you know, the child might have had other shocks that might have caused this colitis? A. Yes, sir.

"Q. Any nervous shock might produce this condition? A. Yes, sir."

He testified further that the last picture of the child's colon showed improvement; that the prognosis in cases like this is very poor; while the patient may appear well and getting along fine, any emotional disturbance will bring on the condition again. In the case of an adult, if he happens to be a stockbroker and stock goes down, colitis will appear. An argument between husband and wife will bring it on, on either one, if they have that condition.

We have given above all of the relevant testimony offered by plaintiff on the question before us. In opposition to the above testimony, defendant offered the testimony of three doctors and several lay

witnesses. Before reviewing their testimony, we will describe the collision. The caboose on the back end of a freight train, which was backing at a rate of speed of about five miles per hour, collided with the left front fender of plaintiff's car and pushed the automobile down the track a distance of from four to seven feet. The automobile did not turn over.

The accident occurred on June 22, 1934, and Martha Jean entered school on the following September. The teacher who taught her reading class testified she was an average reader; that she did not appear to be nervous, and was a fine child, normal in every respect, conduct and otherwise. She made an average grade. The supervising principal of the school attended by Martha Jean testified she had known her for two years, and she appeared normal in every respect, both mentally and physically. Her size was about right for her age. Her record for attendance at school was very good, and above the average; that no medical excuse was ever offered for her absence from school; that she had observed her at mid-morning lunch time, at the school, and that her appetite was normal. She took part regularly in the music program at school, which was conducted daily, and she played in the rhythmic band, and could play any of the instruments. Her grades for the two years in school were average, or above the average. Her mental condition was good, and she had no difficulty in adjusting herself to her social group. She took part in all of the directed games, the same as other children.

A neighbor of plaintiff testified that she had a little girl, nine years of age; that Martha Jean and her child played together regularly; that Martha Jean was normal in every respect.

Dr. Lyles testified he was the health officer for Morehouse parish, and as such he examined Martha Jean at the beginning of school in the years 1935 and 1936. In reply to a question as to his findings from said examination, he testified as follows:

"A. The first of the session. This is the State Board of Health Standard for school children. In the first grade, we weigh them and take their height. The first session of school, 1935, her height was 45, and on April 4, 1936, the height was 48 inches,—a gain of three inches. Extremities negative, nervous diseases negative; enlarged glands 2 plus; cardiac diseases negative. Teeth four plus, tonsils embedded.

"Q. What would you say as to her general condition? A. I would say her general condition—we classify her as a normal child.

"Q. Do you find any children incapacitated or disabled to indulge in what they call directed play or games—do you give a list of those names to the principal of the grammar schools? A. Yes, sir.

"Q. Do you have any children now on that list? A. Yes.

"Q. Is Martha Jean Cobb on that list? A. No, sir."

And further on in his testimony, he said:

"Q. Your examination revealed that her tonsils were embedded? A. Yes, sir.

"Q. Can the condition of embedded tonsils have any effect on the system? A. We know absorption of toxines from embedded tonsils will affect the nervous system, and cause cardiac trouble and nervousness.

"Q. Could that condition bring on intestinal trouble? A. It frequently does.

"Q. State the length of your experience in the practice?"

Dr. Jones testified as follows:

"Q. Do you know Martha Jean Cobb? A. Yes.

"Q. Did you have occasion to examine her during the year 1935? A. I think it was the latter part. I am not positive. Her father brought her to the office for examination and I think it was the latter part of the year, about 1935.

"Q. Some eight months ago? A. Yes, sir; eight or ten months ago.

"Q. What did your examination consist of? A. I put the child on the table and made a physical examination. I made no laboratory tests. Just examined her the best I could.

"Q. What is your opinion of the child, based on your examination? A. I told the father I couldn't find anything wrong with the child. I couldn't find anything from the examination.

"Q. Did she appear to be a normal child? A. I couldn't find anything wrong with her, and I told her father at the time I couldn't.

"Cross-Examination.

"Q. (Mr. Gladney) There are a great many things you could not discover just by a physical examination? A. Yes.

"Q. You did not give a laboratory test and did not take any X-ray pictures? A. I saw the X-rays made at the general hospital.

"Q. Do you qualify as a Roentgenologist? A. No, sir.

"Q. Do you give expert opinions on X-ray pictures? A. No, sir.

"Q. What was the complaint of the child? A. She was complaining, so her father said, of stomach trouble and being nervous.

"Q. You did not interview her enough to make a diagnosis? A. I examined her the best I could, from a physical examination and I couldn't find anything wrong with her, and I told him so and advised him to take her some other place. He told me what he wanted the examination for.

"Redirect Examination

"Q. (Mr. Snelling) You heard the testimony this afternoon relative to spastic colitis? A. Yes.

"Q. State whether or not spastic colitis results from any number of conditions? A. Yes, sir.

"Q. State whether or not it could result from embedded tonsils? A. Any abscess, whether the teeth or the tonsils, could affect the intestinal tract."

Dr. Snelling testified as follows:

"Q. Have you ever examined the child, Martha Jean Cobb? A. I had occasion to examine Martha Jean some several·months ago, in fact a little over a year ago, in 1935, around the 13th or 12th or 11th of June.

"Q. Please state the character of your examination, the nature of your findings and the child's physical and nervous condition? A. Of course, I had a history from her father stating she had been in an automobile accident in which the railroad engine was involved, striking the car according to his history, on the 22nd of June, 1934.

"Q. Approximately a year before you examined the child? A. Yes, sir. She complained of pain in the abdomen and had some nausea and vomiting for several weeks after the accident. Subsequently she had gotten up and gone to school during the year after. The especial complaint was pain in the abdomen and some constipation; there seemed to be no especial complaint or marked complaint.

"He said she was nervous. I found at the time a fairly well developed child, well nourished for that age, apparently normal so far as I could see. By all the common, ordinary factors we take into consideration, I judged her to be a fairly normal girl. On physical examination, I found she was normal with the possible exception there was some irritation in the throat. The examination showed head, neck, chest, back, extremities and abdomen were all negative of pathology at that time.

"In other words, there was no deformities and no masses and no areas of tenderness. There was nothing objective and no indicated trouble at the time I examined her. In confirmation of the physical examination, I had routine laboratory work done, and aside from a little lower red blood corpuscle count than normal, the laboratory findings were negative, so that, in conclusion, while I had a history of complaint which had existed after the accident, I had only one conclusion to come to,—she had recovered from any possible ill effects of the accident and showed nothing objective at the time to explain any of the complaints the father gave me.

"Q. Did you find any sensitivity in her abdomen? A. I went over her abdomen rather carefully and found no area of tenderness.

"Q. Are you familiar with the condition known as spastic colitis? A. Yes.

"Q. What causes or may cause that condition? A. Spastic colitis occurs in the vast majority of cases in adults. It is usually the result of chronic retention over a long period of time. It is usually secondary to something else and usually the result of long continued retention. It may be due to a focal infection elsewhere in the body and thrown into the intestinal tract. It may come from some defect in the intestinal tract such as intestinal parasites; it may come from a diseased appendix; it may come from an infected gall bladder, and from possibly some other sources which I have not mentioned.

"Q. It may originate from any number of causes or conditions? A. Yes.

"Q. Did you find any evidence of spastic colitis? A. The physical evidence of spastic colitis, that is, the objective symptoms on examination would be tenderness along the line of the larger bowel, and the larger bowel ranges on the right, then across the abdomen and then down to the left lower quadrangle, where it runs into the sigmoid part of the bowel. Spastic colitis means a contraction of the larger bowel,

and is shown by tenderness on deep pressure over the course of the intestine.

"Q. You found no such tenderness? A. No, sir, I did not.

"Q. Would the condition of spastic colitis manifest itself in your laboratory findings, if the child has spastic colitis? A. Not necessarily.

"Q. I do not know whether this is a fair question or not. Having examined the child, Martha Jean Cobb, and on the basis of your knowledge of the condition of spastic colitis, and its origin, would you state spastic colitis would be likely to result from having been a party to an accident in which the car in which this child was riding was struck by a train and carried some ten or fifteen feet, the train moving about fifteen miles an hour at the time of striking the car? Would that be likely to produce the condition known as spastic colitis? A. No, and I would like to enlarge on that answer. There is such a condition known as spastic colitis of neurogenic origin, but this type of spastic colitis occurs in adults practically 100 per cent. I only make an exception of some rare parties which I have not had occasion to see, and it is the result of a long period of time and the breaking down of the nervous system over a long period of time. You would not expect to find it in a child. If it did occur as a result of an accident, it would have occurred after a very serious accident, where there had been a great deal of direct violence to the abdomen itself. That would be my opinion.

"Q. What is the normal weight of a girl eight years of age? A. About fifty pounds.

"Q. If you are in a very bad accident, I believe you said of a violent nature, your theory is it would be less likely to affect an adult than a child? A. No, sir. My general idea is that a child, outside of the medical viewpoint—a child generally reacts much more quickly and has less stigma of the accident than an adult, because the child's brain is not developed and its nervous system is not developed to such stage where it appreciates shock as an adult. As we grow older, our nervous system becomes more acute. I do not mean that a child cannot be shocked to that extent; but they react more quickly with less sequalia than an adult. It would take a very terrific shock

something like shell-shock to produce spastic colitis.

"Q. You do not think it would be produced by a train striking an automobile? A. I think the nervous system of anyone could be shocked by an automobile accident, but I would expect one of greater magnitude, resulting in severe injury, creating a lasting impression on the child.

"Q. You do not think children suffer a lasting impression from being subject to an unusual condition? A. They react very quickly and forget about it.

"Q. As a general rule? A. Yes, sir. Of course, there are exceptions to the rule."

He further testified he reached the conclusion the child did not have colitis of any kind, neurogenic or otherwise. She had no indication of any kind of colitis, and he considered her, from his examination, a perfect, normal child of eight years of age. This is the sum and substance of all the testimony as to the condition of Martha Jean at the time of trial below and as to the cause of her condition, if it exists, as claimed by plaintiff.

Plaintiff contends that since the defendant's medical witnesses did not make X-ray pictures of the child's abdomen, they are not as well qualified to state her condition as are the plaintiff's witnesses. The medical profession, the legal profession, and a number of others who are of neither profession, have learned that X-ray pictures are not infallible. We can recall instances in which X-ray pictures disclosed malignant tumors and other irregularities in the abdomen, and when an operation was performed to remove the trouble, it was found not to be there. We also have had many cases before us in which the leading and most eminent radiologists in the state would disagree as to what the picture discloses. This has happened often in cases of fractured bones and vertebrae.

In several cases that have come before us, we have been informed by some of the most eminent radiologists in the state that they could make an X-ray picture show whatever they wanted it to show, and we believe they were correct in their statements. It is not unusual for two X-ray pictures, taken of the same part of the same man, to be different. As we are told by the radiologists, it all depends entirely upon the technique. This being true, and when the injury, as complained of here, is not a fracture, we

know of no reason for rejecting the testimony of a reputable physician who makes a thorough examination of the person involved and arrives at his conclusion, without the aid of X-ray pictures. In this case, the X-ray pictures were not offered in evidence, and it is not shown they were had in court.

When a case is presented wherein plaintiff is asking for damage, because of a disease or condition that does not make its appearance until many months after the accident which is claimed to have caused it, the courts will require very strong testimony to connect the disease, or condition, with the accident; and should require the elimination of all other possible causes. That has not been done in this case. The uncontradicted medical testimony is that Martha Jean had embedded tonsils and infected teeth. The testimony also shows that the embedded tonsils or other infected part of the body could cause nervousness which could, in turn, cause spastic colitis and could infect the intestinal tract. If we should assume that Martha Jean is suffering from spastic colitis, which we doubt the testimony would justify us in finding, it would then be only a guess if we held that the cause of it was the shock to her nervous system received by her in the accident. Her condition could have as well been caused from her embedded tonsils, or from infected teeth.

The lower court rejected the demands of plaintiff upon the same ground we have set out; that is, plaintiff failed to prove the accident was the cause of the alleged condition of Martha Jean. We find no error in the judgment of the lower court, and it is affirmed with costs.